## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| STEVEN YENINAS, on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| AMERICAN AIRLINES, INC.; DELTA AIR LINES, INC.; SOUTHWEST AIRLINES CO.; and UNITED AIRLINES, INC., | |
| Defendants. | |

Plaintiff Steven Yeninas, by and through his undersigned attorneys, complain and allege as follows:

## NATURE OF THE ACTION

1.      This action arises out of a conspiracy by the four largest commercial airlines in the United States—American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc. (collectively, "Defendants")—which began no later than January 1, 2009, and continues to the present (the "Class Period"), to fix, raise, maintain, and/or stabilize prices for air passenger transportation services within the United States, its territories and the District of Columbia in violation of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3), by, among other things, colluding to limit seat capacity.

2.      Since at least 2009, the Defendants have been signaling to each the gospel of limiting airline capacity in order to artificially inflate their airfares and profits. This has led, over the last year and a half, to substantial increases in airfares during a period where jet fuel prices have plummeted.

3.      In May of 2015, Gary C. Kelly ("Kelly"), the CEO of Southwest Airlines Co., broke ranks and made a public statement that his company was willing to make a significant increase in capacity at is hub in Dallas, Texas. Executives of other airlines reacted at the annual meeting of the International Air Transport Association ("IATA") the following month, saying the "industry" had to hold the line on "capacity discipline." Kelly promptly retracted his plans.

4.      At the urging of members of Congress, the Antitrust Division of the United States Department of Justice ("DOJ") issued civil investigative demands ("CIDs") to the Defendants and, for the first time in 2015, airfares plunged.

5.      The conduct at issue constitutes a violation of federal antitrust laws.[1]

## JURISDICTION AND VENUE

6.      This complaint is filed under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

7.      Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, and/or have agents within this District, and a substantial part of the events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District.

---

[1] This is not the first case to allege collusive coordination on capacity reduction between major United States passenger airlines. A similar claim was advanced against Delta Air Lines, Inc. and AirTran where it was alleged that such conduct was carried out through public signaling by the executives of each company; a motion to dismiss that claim was denied. *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1359-62 (N.D. Ga. 2010).

8.      This Court has personal jurisdiction over Defendants because, *inter alia,* each: (a) transacted business in this District; (b) directly or indirectly sold and delivered passenger air transportation in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PLAINTIFF

9.      Plaintiff Steven Yeninas is a current resident of the District of Columbia.  During the Class Period, Plaintiff purchased air passenger transportation services directly from one of more of the Defendants and has suffered pecuniary injury by paying artificially inflated ticket prices as a result of the antitrust violation alleged herein.

## DEFENDANTS

10.     Defendant American Airlines, Inc. ("American") is a domestic corporation with its principal place of business located at 4333 Amon Carter Boulevard, Fort Worth, TX 76155. American conducts air passenger transportation services throughout the United States, including flights sold and purchased in this District.

11.     Defendant Delta Air Lines, Inc. ("Delta") is a domestic U.S. company with its headquarters at 1030 Delta Boulevard, Atlanta, Georgia, 30354.  Delta conducts air passenger transportation services throughout the United States, including flights sold and purchased in this District.

12.     Defendant Southwest Airlines Co. ("Southwest") is a domestic U.S. company with its headquarters at 2702 Love Field Drive, Dallas, Texas, 75235.  Southwest conducts air passenger transportation services throughout the United States, including flights sold and

purchased in this District.

13.     Defendant United Airlines, Inc. ("United") is a domestic U.S. company with its headquarters located at 233 S. Wacker Drive, Chicago, Illinois, 60606.  United conducts air passenger transportation services throughout the United States, including flights sold and purchased in this District.

## NON-PARTY CO-CONSPIRATORS

14.     On information and belief, at all relevant times, other airlines, entities, and/or persons, including, but not limited to, U.S. Airways (prior to its merger with American Airlines) willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

## AGENTS

15.     The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

16.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the provision of air passenger transportation services transmitted interstate between and among offices of Defendants and their customers located throughout the world, including throughout the United States.

17.     Throughout the Class Period, Defendants transported substantial numbers of passengers in a continuous and uninterrupted flow of interstate commerce between various airports in the United States.

18.     Throughout the Class Period, Defendants' unlawful activities, as described herein,

took place within and substantially affected the flow of interstate commerce and had a direct,

substantial, and reasonably foreseeable effect upon commerce in the United States.

## FACTUAL ALLEGATIONS

## CONCENTRATION IN, CONSOLIDATION OF, AND SHARED OWNERSHIP IN THE AIRLINE INDUSTRY

19.      The domestic airline passenger industry is a tight oligopoly. Due to a series of

mergers, particularly since 2008, American, Delta, United and Southwest now control

approximately 80% of the domestic air passenger seats.

20.      The current oligopolistic structure of the industry is the product of several airline

mergers that are depicted in the following chart:



21.     In short, the industry went from ten major domestic air-passenger carriers to four

within a decade. Average market concentration in airline hubs from 2004-14, as measured by the

Herfindahl-Hirschman Index was between 3,400 to 3,750, according to a September 22, 2015

letter from the American Antitrust Institute ("AAI") to DOJ.[2] The AAI, in a 2013 study, noted

that prior to and after the Delta-Northwest merger, 10% of airport pairs were eliminated from the

merged entity's network; similarly figures for the United-Continental and Southwest-AirTran

mergers were 9% and 22%, respectively.[3] The toll has had a particularly adverse impact on

capacity reduction at airports serving smaller cities.[4]

22.     In the DOJ's complaint that was filed in *United States v. U.S. Airways Group,*

*Inc.*, No. 13-cv-01236  (D.D.C.) on August 13, 2013,[5] which challenged the merger of American

and U.S. Airways, the DOJ noted its concerns about the increasing consolidation and coordinated

anticompetitive conduct in the domestic air passenger industry.

23.     Specifically, the DOJ noted that "[t]he structure of the industry is already

conducive to coordinated behavior." As one example, the DOJ noted that airlines closely watch

each other's fares and match each other's fare increases. As another example, the DOJ pointed to

the use of "cross-market initiatives" ("CMIs") to deter fare wars. "A CMI occurs where two or

more airlines compete against each other on multiple routes. If an airline offers discounted fares

---

[2]
http://www.antitrustinstitute.org/sites/default/files/Letter%20to%20DOJ_Collusion%20Probe_F.pdf.

[3] http://www.antitrustinstitute.org/sites/default/files/AAI_USAir-AA_Efficiencies.pdf.

[4] http://dspace.mit.edu/bitstream/handle/1721.1/90076/890141840-MIT.pdf?sequence=2

[5] http://www.justice.gov/file/514531/download. *See also* August 13, 2013 DOJ Press Release (available at http://www.justice.gov/opa/pr/justice-department-files-antitrust-lawsuit-challenging-proposed-merger-between-us-airways-and.

in one market, an affected competitor often responds with discounts in another market—a
CMI—where the discounting airline prefers a higher fare. CMIs often cause an airline to
withdraw fare discounts."

24.     The DOJ also noted past express coordinated behavior by the airlines in the form
of the creation of Airline Tariff Publishing Company ("ATPCO"), a "dedicated price-telegraph
network for the industry." As the DOJ explained, "[t]he airlines use ATPCO to monitor and
analyze each other's fares and fare changes and implement strategies designed to coordinate
pricing. Airlines have previously used ATPCO to engage in coordinated behavior. In 1992, the
United States filed a lawsuit to stop several airlines, including both defendants, from using their
ATPCO filings as a signaling device to facilitate agreements on fares. That lawsuit resulted in a
consent decree, now expired."[6]

25.     The DOJ also noted direct communications among airlines on airfares. It gave the
following example:

> US Airways also has communicated directly with a competitor
> when it was upset by that competitor's efforts to compete more
> aggressively. In 2010, one of US Airways' larger rivals extended
> a "triple miles" promotion that set off a market share battle among
> legacy carriers. The rival airline was also expanding into new
> markets and was rumored to be returning planes to its fleet that
> had been mothballed during the recession. US Airways' CEO
> complained about these aggressive maneuvers, stating to his
> senior executives that such actions were "hurting [the rival
> airline's] profitability – and unfortunately everyone else's." US
> Airways' senior management debated over email about how best
> to get the rival airline's attention and bring it back in line with the
> rest of the industry. In that email thread, US Airways' CEO urged
> the other executives to "portray[] these guys as idiots to Wall
> Street and anyone else who'll listen." Ultimately, to make sure the
> message was received, US Airways' CEO forwarded the email
> chain—and its candid discussion about how aggressive
> competition would be bad for the industry—directly to the CEO

---

[6] *United States v. Airline Tariff Pub. Co.*, 836 F. Supp. 9 (D.D.C. 1993). *See*
http://faculty.haas.berkeley.edu/borenste/download/atpcase1.pdf.

of the rival airline. (The rival's CEO immediately responded that it was an inappropriate communication that he was referring to his general counsel.)

26.     The DOJ further observed that "[i]n essence, industry consolidation has left fewer, more-similar airlines, making it easier for the remaining airlines to raise prices, impose new or higher baggage and other ancillary fees, and reduce capacity and service." It went on to note:

> Increasing consolidation among large airlines has hurt passengers. The major airlines have copied each other in raising fares, imposing new fees on travelers, reducing or eliminating service on a number of city pairs, and downgrading amenities. An August 2012 presentation from US Airways observes that consolidation has resulted in "Fewer and Larger Competitors."
>
> The structural change to "fewer and larger competitors" has allowed "[t]he industry" to "reap the benefits." Those benefits to the industry are touted by US Airways in the same presentation as including "capacity reductions" and new "ancillary revenues" like bag fees.

27.     The DOJ's complaint also discussed at length  how the history of airline mergers had led to airline capacity reductions. Given its significance in the present context, that portion of the complaint is quoted below:

> Legacy airlines have taken advantage of increasing consolidation to exercise "capacity discipline." "Capacity discipline" has meant restraining growth or reducing established service. The planned merger would be a further step in that industry-wide effort. In theory, reducing unused capacity can be an efficient decision that allows a firm to reduce its costs, ultimately leading to lower consumer prices. In the airline industry, however, recent experience has shown that capacity discipline has resulted in fewer flights and higher fares.
>
> Each significant legacy airline merger in recent years has been followed by substantial reductions in service and capacity. These capacity reductions have not consisted simply of cancellation of empty planes or empty seats; rather, when airlines have cut capacity after a merger, the number of passengers they carry on the affected routes has also decreased.

US Airways has recognized that it benefitted from this industry consolidation and the resulting capacity discipline. US Airways has long taken the position that the capacity cuts achieved through capacity discipline "enabled" fare increases and that "pricing power" results from "reduced industry capacity." US Airways' CEO explained to investors in 2006 that there is an "inextricable link" between removing seats and raising fares.

In 2005, America West—managed then by many of the same executives who currently manage US Airways—merged with US Airways. America West had hubs in Phoenix and Las Vegas while the former US Airways had hubs in Pittsburgh, Charlotte, and Philadelphia. Following the merger, the combined firm reduced capacity, including significant cuts in Pittsburgh and Las Vegas. In 2010, the Chief Financial Officer for US Airways explained:

> We believe in the hub system. I just think there's too many hubs. If you look across the country, you can probably pick a few that are smaller hubs and maybe duplicative to other hubs that airlines have that they could probably get out of. In our example, we merged with US Airways [and] . . . what we have done over time, which is unfortunate for the cities, but we couldn't hold a hub in Pittsburgh and we couldn't hold a hub in Las Vegas. So over time we have consolidated and condensed our operation back, which is really important, condensed it back to our major hubs.

A post-merger US Airways analysis confirmed that it succeeded in obtaining a "3% to 4% capacity reduction."

In 2006, on the heels of the America West/US Airways merger, the combined firm submitted an ultimately unsuccessful hostile bid for Delta Air Lines. US Airways' management had concluded that a merged US Airways/Delta could reduce the combined carrier's capacity by 10 percent, which would lead to higher revenues for the combined firm and for the industry. In 2007, following the rejection of the hostile bid, US Airways' CEO explained to investors how the deal would have increased industry profits:

> It's part of what we tried to impress upon people as we were going through our run at Delta, was that . . . it was good for US Airways [and] good for the entire industry. We're going to take out 4% of the industry capacity as we did that. Everyone's 2008

> numbers would look a (expletive) of a lot better had
> that transaction happened . . . .

In 2008, Delta merged with Northwest Airlines. Despite promises to the contrary, the combined airline reduced capacity, including significant cuts at its former hubs in Cincinnati and

Memphis. US Airways' CEO was "quite happy" to see the merger and advocated for further consolidation. He explained that an industry structure of "five different hub and spoke airlines with who knows how many hubs across the United States . . . results in all of us fighting for the same connecting passengers over numerous hubs." Left unsaid was that fewer airlines meant less competition and higher fares.

In May 2010, United Airlines and Continental Airlines announced their planned merger. The announcement caused speculation about the future of each airline's hubs, including Continental's Cleveland hub. In Congressional testimony, an industry analyst stated that he did not believe the merger would cause reductions in Cleveland. On June 18, 2010, upon seeing the testimony, US Airways' CEO wrote an email to other US Airways executives stating, "[s]urely these guys [United/Continental] aren't really planning to keep Cleveland open. I'm hopeful they're just saying what they need to (including to [the analyst]) to get this approved." United and Continental closed their deal on October 1, 2010. The combined firm has reduced capacity at nearly all of its major hubs (including Cleveland) and at many other airports where the two airlines previously competed. Similarly, Southwest/AirTran has reduced service in a number of its focus cities and on many of AirTran's former routes following its 2011 merger.

The defendants are fully aware of these earlier mergers' effects. A 2012 American Airlines analysis concluded that "following a merger, carriers tend to remove capacity or grow more slowly than the rest of the industry." US Airways' management concluded that although industry consolidation has been a success, as its CEO stated publicly in 2010, the industry had yet to hit its "sweet spot," and additional consolidation was needed because the industry remained "overly fragmented."

A merger with American would allow US Airways to hit the "sweet spot." For consumers, however, it would be anything but sweet. US Airways believes that merging with American "finishes industry evolution" by accomplishing US Airways' goal of "reduc[ing] capacity more efficiently." When first considering a

combination with American, US Airways projected that the
merged firm could reduce capacity by as much as 10 percent.
Similarly, American expects that the merger will lead to capacity
reductions that would negatively impact "communities," "people,"
"customers," and "suppliers." Higher fares would be right around
the corner.

28.     The DOJ ultimately settled the case, allowing the merger to occur, conditioned on

the divestiture of certain flight slots. The merger has been consummated, resulting in significant

further consolidation, and U.S. Airways ceased operations in October of 2015.[7]

29.     One casualty of the merger was U.S. Airways' Advantage program, which offered

significant discounts on connecting flights.[8] Pursuant to the program, price sensitive customers

could get discounted fares, especially for last minute bookings. The DOJ compared fares for a

trip from Houston to New York City on August 13, with a return trip on August 14. U.S.

Airways offered a one-stop fare from $575, while the prices for United, Delta and American

were from $1331, $1467 and $1467, respectively.[9]

30.     This demonstrates another effect of the current market environment: identical

airfares charged by ostensibly competing air passenger carriers. On July 2, 2015, McClatchyDC

published an article comparing airfares for various flights:

For example, tickets for nonstop flights to five destinations served
by two competing carriers from Charlotte Douglas International
Airport in North Carolina are largely identical.

– A round-trip economy class ticket from Charlotte to Chicago
O'Hare, departing on Sept. 9 and returning Sept. 14, costs $252 on
both United and American.

---

[7]https://www.washingtonpost.com/business/the-last-days-of-us-airways/2015/09/25/f5530686-
60a6-11e5-8e9e-dce8a2a2a679_story.html.

[8] http://marketrealist.com/2014/07/overview-impact-eliminating-advantage-fare-program/.

[9] http://www.mcclatchydc.com/news/nation-world/national/economy/article26083942.html.

– An economy round-trip ticket from Charlotte to Houston Intercontinental on those days costs $327 on those same two carriers.

– An economy round trip on American and Delta from Charlotte to Detroit Metropolitan on those same days costs $350.

– A round-trip flight from Charlotte to New York's LaGuardia airport costs $220 on American and Delta, while a round trip from Charlotte to Newark Liberty on the same days costs $199 on American and United.[10]

31.     In sum, as one industry analyst noted, the "new structure" is one of "air travel oligopoly."[11] This created a situation where collusion can thrive. As Assistant Attorney General William Baer noted in press remarks on July 14, 2015, "[i]n my experience looking at markets with just a few players, sometimes there is a temptation to coordinate behavior."[12]

32.     The domestic airline passenger industry is a tight oligopoly. American, Delta, United and Southwest now control approximately 80% of the domestic air passenger seats.

33.     The average domestic airfare rose 13 percent from 2009 to 2014, according to data from the federal Department of Transportation's Bureau of Transportation Statistics.[13] The following chart from that agency's website shows fourth quarter 2014 average domestic air fares from 1995 to 2014:

---

[10] *Id.*

[11] http://airwaysnews.com/blog/2014/12/30/us-airlines-wont-lose-capacity-discipline-because-of-oil/.

[12] https://bol.bna.com/antitrust-chief-turns-his-sights-to-airlines/.

[13] http://www.rita.dot.gov/bts/press_releases/bts021_15.





Source: Bureau of Transportation Statistics, BTS Air Fares, Origin and Destination Survey

34. AAI did its own analysis of fare increases in the aforementioned letter to DOJ.[14] It found that average real fares across airline hubs declined by 12% from 2004-09, even though fuel costs increased by 33% during the same period. All of that changed in the 2009-14 period:

> From 2009–2014, for example, the increase in average fares across hubs was 15%. This rate of growth far outstripped that of fuel costs, which slowed to less than 5% over the second period.

> Indeed, four of the five years from 2009–2014 were marked by flat or declining fuel costs for the Big 4. By 2014, operating margins had increased to 8.6% and the airlines were strongly profitable. This second period includes the three mergers of United-Continental, Southwest-AirTran, and US Airways-American. Significantly higher fares and slower rates of increase in fuel costs, and strong return to profitability marked this phase.[15]

35. Southwest used to be regarded as a price-cutter in some regions. But under current market conditions, that is no longer true. An October 18, 2012 Associated Press article makes this point:

> While Southwest rolls out the occasional sale to fill planes -- they were 82.1 percent full, a record for the quarter -- it has also been aggressive about trying to raise fares in recent months.

---

[14]http://www.antitrustinstitute.org/sites/default/files/Letter%20to%20DOJ_Collusion%20Probe_F.pdf.

[15] *Id.*

> It launched two of the three fare increases that stuck during the quarter, according to a tally by Rick Seaney, CEO of air-travel website FareCompare.com.
>
> And when an attempted increase by United Airlines last week faltered, Southwest came along and revived it. Seaney wrote that it was the first time he remembers a low-cost airline reviving a failed domestic price hike in almost a decade of watching fares.[16]

36.     Suring the past several years, the four Defendant airlines also began collecting

new ancillary fees, such as $25 each way to check a bag and $200 to change a reservation. As a

result, the industry has earned record profits. As *Forbes* noted in May of 2015:

> The year 2015 began on an optimistic note for the US airline industry as the major airlines - American Airlines, United Continental Holdings, Delta Air Lines, Alaska Air Group, Southwest Airlines, and JetBlue Airways - posted consolidated net income of over $3 billion during the first quarter. The performance was particularly striking as the first quarter has traditionally been the weakest quarter for the industry due to seasonal fluctuations. The major reason behind the sudden surge in the industry's profitability was the plummeting crude oil prices over the last nine months. Other factors that influenced the industry's performance included capacity restraint and the strengthening of the US dollar against other currencies.
>
> Most of the airlines either matched or exceeded the consensus earnings estimate for the March quarter. Delta initiated the earning season with its remarkable profits of $746 million in the quarter - almost thrice the profit earned a year ago – making it the best first quarter for the airline. American, the world's largest airline in terms of traffic, posted whopping profits of $932 million on the back of fuel cost savings of $1.2 billion during the quarter. United earned a profit of $508 million in the latest quarter - beating the consensus estimate by more than $0.08 per share – an improvement of $1 billion over the loss of $609 million incurred in the same quarter last year.

IATA is predicting net after-tax profits for North American airlines of $13.2 billion, which

---

[16] http://www.cleveland.com/business/index.ssf/2012/10/southwest_airlines_posts_small.html.

exceeds the peak reached in the 1990s.[17]

37.    One reason for the high profits in 2015 has been the declining cost of jet fuel

without corresponding decreases in fares. It has been estimated that in April of 2015, United

States airlines paid $1.94 a gallon for jet fuel, a decrease of 34 percent from the previous year.

One would expect that in a competitive industry, airfares would decrease as a result, while

airlines sought to obtain greater market shares. That has not happened. Delta CEO Richard

Anderson was candid about his company's exploitation of the free fall in jet fuel prices:

> It's wonderful that fuel has run down–we love it. There's a $2
> billion opportunity out there if we hold fare levels constant. But
> over the very long-term horizon, it's just more conservative and
> prudent to use a high fuel assumption when you're buying
> airplanes or making other investments, and then when it comes in
> lower, hang on to all of it.[18]

38.    "The idea that U.S. airlines would, once again, devolve into a war for market

share is founded on a misunderstanding of the new structure of U.S. airlines," Vinay Bhaskara,

an industry analyst, wrote in *Airways News*.[19] He added that "[r]emember, this is the same

management group that (instead of allowing passengers to reap a modest reduction in fares)

responded to the F.A.A.'s inability to collect taxes in mid-2011 by gleefully raising base fares to

where total out-of-pocket costs were exactly the same (earning a windfall of $28.5 million per

day)."[20] United States Senator Charles E. Schumer ("Schumer") has echoed this point, stating in

December of 2014 that "[a]t a time when the cost of fuel is plummeting and profits are rising, it

---

[17]  https://www.iata.org/whatwedo/Documents/economics/Economic-Performance-of-the-Airline-Industry-mid-year-2015-forecast-slides.pdf.

[18] http://qz.com/324981/the-airline-executives-standing-between-you-and-cheap-plane-tickets/.

[19] http://www.nytimes.com/2015/03/24/business/dealbook/as-oil-prices-fall-air-fares-still-stay-high.html.

[20] *Id.*

is curious and confounding that ticket prices are sky-high and defying economic gravity….The

industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting

for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and

come down like a feather." [21]

39.     In addition to rising airfares, mergers have led to decreased head-to-head

competition among the Defendants. Associated Press has documented this point in a July 14,

2015 article:

> "Airlines aren't going at each other like they used to," said Mike
> Boyd, an aviation consultant frequently hired by airports. "They
> have their turf, and they very rarely go to the mattresses with one
> another."
>
> At 40 of the 100 largest U.S. airports, a single airline controls a
> majority of the market, as measured by the number of seats for
> sale, up from 34 airports a decade earlier. At 93 of the top 100,
> one or two airlines control a majority of the seats, an increase
> from 78 airports, according to AP's analysis of data from Diio, an
> airline-schedule tracking service.
>
> . . . .
>
> Still, "the airline industry is less competitive now than it used to
> be," said Seth Kaplan, managing partner of industry newsletter
> Airline Weekly. "Some of us used to have eight or nine airlines to
> choose from. Now we have maybe four or five, just as we have
> four or five cellphone companies to choose from."
>
> The mergers have altered the competitive landscape at airports big
> and small.
>
> — In Indianapolis, the two leading airlines controlled just 37
> percent of the seats a decade ago, and domestic fares were 9
> percent below the national average. Then the city's main airline,
> ATA, went bankrupt and was bought by Southwest, and its No. 2
> carrier, Northwest, was absorbed by Delta. Now two airlines
> control 56 percent of the seats, and airfares are 6 percent above
> the national average.

---

[21] *Id.*

— The Dayton, Ohio, airport was served by 10 airlines in 2005, and fares were 5 percent below average. Today, just four airlines fly there and prices are almost 10 percent above average.

— Big hub airports aren't immune. In 2005, US Airways controlled nearly 66 percent of the seats in Philadelphia. Now that US Airways has merged with American, the combined airline has 77 percent of the seats. Airfare has gone from 4 percent below average to 10 percent above it.

— Delta's hold on Atlanta, the world's busiest airport, increased during that same period from 78 percent of seats to just over 80 percent. At the same time, low-cost AirTran merged into Southwest and reduced flights there. Domestic airfares at the airport went from nearly 6 percent below average to 11 percent above.

— Some cities are actually seeing lower fares than they did a decade ago. Prices in Denver were once 5.6 percent higher than the national average. Now that United's market share there has dropped to 41 percent from 56 percent, fares are almost 15 percent lower than the rest of the country.

Recent deals indicate the big airlines intend to stick to a strategy of dominating one airport and forgoing marginal service elsewhere.

For instance, United announced in June that it will abandon Kennedy Airport and move its dwindling number of JFK flights to New Jersey's Newark airport, where it already controls 68 percent of the seats. At the same time, if regulators go along, Delta will further shrink its small presence at Newark and take over United's share at JFK, where Delta is already top dog.[22]

40.     The concentrated structure of the United States air passenger industry is matched

by the concentrated number of major investors in the major passenger airlines. This is reflected

in the following chart from BloombergBusiness:[23]

---

[22] http://bigstory.ap.org/article/7f964b3e484d4b43b732424dd9df0975/airlines-carve-us-markets-dominated-1-or-2-carriers.

[23] http://www.bloomberg.com/news/articles/2015-09-22/do-airfares-rise-when-carriers-have-same-investors-u-s-asks



41.    BloombergBusiness reports that the four largest stockholders in the Defendant airlines are BlackRock, Inc. ("BlackRock"), State Street Corporation, J.P. Morgan Chase & Co., Primecap, and Capital Group Companies (which operates the American Funds group).[24]

42.    The academic literature supports the conclusion that such cross-ownership of airlines can lead to higher airfares. In April of 2015, The Ross School of Business at the University of Michigan released a study by Jose Azar, Martin C. Schmalz and Isabel Tecu entitled "Anti-Competitive Effects of Common Ownership"[25] ("Azar-Schmalz-Tecu Study"). It focused on common ownership in the airline industry, looking at the impact of BlackRock's acquisition of Barclays Global Investors ("BGI") in 2009 (BGI also had significant investment positions in domestic air passenger carriers). The study found that such common ownership translated to 3%-11% higher ticket prices. While Schmalz had no evidence to offer of actual collusion, he gave two possible reasons for this correlation:  (1) "airline executives may hold back from aggressive competition -- expanding capacity, for example, or lowering prices -- because they know it's not in the interests of their biggest shareholders, which also own stakes in their competitors", and  (2) airline executives "could in theory coordinate moves on pricing or

[24] http://www.mb.com.ph/us-govt-probes-4-largest-us-airlines-for-fare-collusion/.

[25] http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2427345.

capacity by communicating strategy through discussions with large investors."[26]

The study was presented to the DOJ which provided suggestions to the author.[27]

43.     A 2015 article by Einar Elhauge entitled "Horizontal Shareholding"[28] makes the similar point that when a common set of investors own significant shares in companies that compete with each other in a concentrated market, anticompetitive price increases are likely to occur.

### CAPACITY AND PRICING IN THE INDUSTRY PRIOR TO 2009

44.     In enacting the Airline Deregulation Act of 1978, Congress "plac[ed] maximum reliance on competitive market forces and on actual and potential competition" in the air transportation industry. 49 U.S.C. §40101 (a)(6). For decades, that purpose was largely served; there were recurring price wars over domestic air passenger fares, constant increases in airline capacity (as measured by available seat miles), and vigorous price competition.[29]

45.     IATA, to which American, Delta and United all belong, preached the gospel of capacity discipline. As early as September of 2003, told the members of IATA in Montreal that "[c]apacity control is also a key issue" and that "[t]oo often in the past, our industry has been

---

[26] http://www.bloomberg.com/news/articles/2015-09-22/do-airfares-rise-when-carriers-have-same-investors-u-s-asks.

[27] *Id.*

[28] http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2632024.

[29] The price competition that occurred is documented in the economic literature. *See, e.g.,* Megan Busse, "Firm financial condition and airline price," 33 RAND J. of Econ. 298 (Summer 2002) (http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.164.6100&rep=rep1&type=pdf); Steven Morrison & Clifford Winston, "Causes and Consequences of Airline Fare Wars" (1996) (http://www.brookings.edu/~/media/Projects/BPEA/1996-micro/1996_bpeamicro_morrison.PDF).

focused on market share at the expense of profitability."[30] Bisignani repeated this theme in a 2006 speech delivered in Paris: "[l]et's start at home. Sometimes we have been our own worst enemy—chasing growth instead of profitability. As discussed, we changed after 2001. But let's be frank. We are now benefiting from a strong global economy. And record aircraft orders could be our Achilles heel *if we stop managing capacity carefully*." (Emphases added).[31] Similarly, Bisignani said in a June 2010 speech delivered in Berlin that one of the risks facing the industry was "excess capacity"; "[t]he discipline of chasing profits, not market share, is the only way to protect the bottom line."[32]

46.     As noted above, the DOJ had indicated that a reduction in capacity had accompanied the merger of America West and US Airways in 2005 and the merger of Delta and Northwest Airlines in 2008. After the economic crash of 2008, the members of the industry became very receptive to the message of "capacity discipline." When the economy improved in 2009, the question arose whether the industry would return to its former ways of adding airline capacity and decreasing fares. The members of the industry made a conscious, joint decision not to do so.

**"CAPACITY DISCIPLINE" DURING 2009-15**

47.     Consensual capacity reduction among United States airlines commenced in 2009, when the industry as a whole reduced airline capacity by 10%.[33]

48.     The industry's new approach was reflected in statements made at the Bank of

---

[30] http://www.iata.org/pressroom/speeches/Pages/2003-09-09-02.aspx.

[31] http://www.iata.org/pressroom/speeches/Pages/2006-06-05-01.aspx.

[32] http://www.iata.org/pressroom/speeches/Pages/2010-06-07-01.aspx.

[33] http://www.fundatia-aleg.ro/module-pagesetter-viewpub-tid-28-pid-4338.phtml.

America Merrill Lynch Investment Conference in mid-2010, around the time that United and

Continental Airlines announced their merger. The following article described some of those

statements:

> *The consensus among airline executives is that the industry will exercise "capacity discipline" by resisting the temptation to re-insert seats in markets that show strengthening demand.* Should the industry exhibit such behavior, it likely would mean more crowded airplanes and could provide carriers the impetus to raise fares and an opportunity to take another run at sustained profitability.

> "The No. 1 question I get from investors is, 'Is it different this time, or is the industry going to do what it has always done in the past and start growing again?'" said US Airways president Scott Kirby, speaking this week at a Bank of America investment conference. "I think it is different this time--and I know you should always be careful when saying that because any time you say that about anything it's rarely different--but it feels different this time for good rational reasons."

> Most importantly, Kirby said, is that the entire industry--including low-cost carriers--"recognizes that we are a mature industry. This isn't a growth industry any more. It's hard to rationalize all the capacity that exists today, and it's even harder to rationalize new capacity on a going-forward basis. It is hard to justify buying new airplanes when you know that fuel could go back to $150 a barrel.

> *"The industry, by and large, has CEOs with different views than the CEOs of yesteryear," Kirby continued. "They are much more focused on returns and financial performance than they are on empire building, 'how big is my airline, what is my market share, how many cities do I fly to,' etc. Things can change in a hurry, but I don't think rapid capacity growth is going to become a problem in this industry, at least for the foreseeable future."*

> Speaking at the same conference, Delta Air Lines president Ed Bastian also cited capacity discipline, volatile fuel prices and management focus on shareholder value. "You have companies that have gone through the bankruptcy process and are highly sensitized to generating and delivering the kind of return that is required," he said. *Bastian also predicted that industry consolidation would progress, "allowing us to manage the overall capacity levels in a better way. You'll see the alliances deliver that same discipline from an international standpoint."*

American Airlines CEO Gerard Arpey agreed that the proposed United-Continental merger "will allow for one fewer choice in the marketplace and should contribute to a more rational balance between supply and demand.

"If we assume the current economic recovery has legs, then I think as an industry we are much better positioned to leverage the upturn than we have been in previous recoveries," Arpey continued. "There are far fewer seats for sale in the marketplace today than there were five years ago. There are also hopeful signs that the industry has learned its lesson about keeping capacity growth in line with demand--and will continue to apply that lesson even as the economy comes back."

Last month, J.P. Morgan analysts expressed sentiments similar to those shared this week by airline leaders. "Management composition appears stronger to us today than at any time in the past," they wrote in a May 25 research note. "No former heads of Boeing's 737 and 757 programs are running U.S. airlines, ordering aircraft. No airline is majority-owned by labor and run primarily for its benefit. The nation's largest discounter [Southwest Airlines] appears more interested in margin than market share, having ceased growth for the first time in its history. *While always dangerous to proclaim 'It's different this time,' the fact of the matter is that, by all fundamental measures, it appears to us to be true.*"[34]

49.     Thus, the leaders of the industry indicated they were breaking away from past competitive practices and were entering a new era of "capacity discipline," a new era that they predicted confidently would continue. This certainty had to be based on an underlying agreement among the major United States airlines.

50.     It did continue. In September of 2011, various airline executives spoke at a Deutsche Bank conference about what had happened in that year and what would happen in 2012. The *Wall Street Journal* reported on what was said:

Speaking at a Deutsche Bank investor conference, airline executives provided the first guidance that capacity cuts already planned for the fall would continue into next year.

---

[34] *Id*. (Emphases added).

Ed Bastian, the president of Delta, the second-largest airline by traffic, said the airline will extend its planned 4% to 5% fourth-quarter cut in capacity into the first quarter of 2012. The airline plans to cut capacity by 2% to 3% for all of 2012, compared with 2011.

Jeff Smisek, United's chairman and chief executive, said the carrier next year will keep consolidated capacity, which includes its mainline flights and those outsourced to regional partners, in line with 2011 levels. The largest U.S. carrier by traffic plans to offset a "modest decrease" in domestic traffic next year with an increase in international flying, Mr. Smisek said, boosted by the expected arrival of the first six of its delayed Boeing Co. BA 3.63 % 787 Dreamliners.

At the event, Southwest Chief Financial Officer Laura Wright said the airline, the largest carrier of domestic passengers, would keep capacity flat "or slightly down" next year.

Meanwhile, Beverly Goulet, vice president and treasurer of American Airlines parent AMR Corp., said American will reduce its fourth-quarter capacity this year an additional 0.5%. American is taking "a very close look" at its capacity plans for 2012, she added.[35]

51.     The coordinated capacity discipline led to higher airfares and fewer seats. As

*Forbes* noted in a June 2014 article:

In the following years [after 2009], even as the demand environment improved, network airlines did not add significant capacity. Delta Airlines for instance, raised its capacity by only 1% during 2009-2013. United lowered its flying capacity from 253 billion miles in 2011 to 245 billion miles in 2013. American also did not add significant flying capacity to its network during this period. As these large airlines maintained steady flying capacity even as demand for air travel rose driven by economic recovery, overall industry air fares increased. This is also highlighted by data from the Bureau of Transportation Statistics which shows that average round-trip air fares in current dollars increased by 17% during 2007-2013…. The capacity discipline was so retained that even today the overall flying capacity in the domestic U.S. air travel market is below its pre-recession level. The total available seat miles in the domestic air travel market were 693 billion miles in 2013, down from 744 billion miles in

---

[35] http://www.wsj.com/articles/SB10001424053111903532804576568922672945908.

2007.[36]

52.     At the beginning of 2015, the industry's vigorous application of "capacity discipline" was unabated. A January 2015 article from *Air Transport World* described what occurred in 2014 and the airline executives' commitment to continue "capacity reduction" this year:

> Huge profits. Low fuel prices. Strong demand. In the past, those factors would likely have led major US airlines to ramp up capacity…but no longer. The US's three global full-service airlines—Delta    Air    Lines, United    Airlines and American Airlines—have all vowed to maintain strict capacity discipline.
>
> United and American both plan to stay below 3% capacity growth in 2015. Delta has not provided full-year capacity guidance (though president Ed Bastian has said domestic capacity will probably grow "somewhere in the 2% to 3% range"), but has said its March quarter capacity will rise just 3% schedule-over-schedule (factoring in all of last year's winter storm-related cancelations, Delta's first-quarter capacity could rise as much as 5%). That follows low growth in 2014, a year in which all three airlines stayed below 3% year-over-year capacity expansion (United 0.5%, American 2.4% and Delta 3%).
>
> "We are not making any changes to our 2015 capacity plan in light of the lower fuel prices," Delta CEO Richard Anderson told analysts and reporters last week when discussing the carrier's 2014 earnings. "In fact, we continue to trim capacity on the margin to maintain yields and our RASM premium."
>
> Similarly, United chairman, president and CEO Jeff Smisek told analysts and reporters last week, "We're going to run the airline for profit maximization and we're very focused on capacity discipline … We will absolutely not lose our capacity discipline." United plans to grow capacity no more than 2.5% this year.
>
> American plans to increase 2015 capacity 3% year-over-year domestically and 1.5% internationally. CFO Derek Kerr said this week, "You won't see any changes from us in the near future" on

---

[36] http://www.forbes.com/sites/greatspeculations/2014/06/20/airline-industry-will-have-to-maintain-capacity-discipline-to-remain-profitable/.

the capacity plan.[37]

As Jeff Smisek, the former CEO of United, was quoted as saying in a January 2015 article after United announced a $2 billion profit in 2014, capacity discipline is "very healthy for us and very healthy for the industry."[38]

53.      AAI in the aforementioned letter to DOJ noted that the domestic load factor for the Big Four airlines was 76% in 2004 and 86% in 2014.[39] The "capacity discipline" strategy served this goal. As the AIA remarked, "a CEO that says he or she will hold capacity increases to 2%, so long as others do, has potentially solicited collusive behavior. The conditionality of such a capacity strategy also exceeds the bounds of normal business behavior."[40]

54.      This industrywide strategy paid off handsomely for the market leaders, as reflected in the following chart published in Bloomberg Business:[41]

---

[37] http://m.atwonline.com/blog/maintaining-capacity-discipline.

[38] http://www.usatoday.com/story/news/2015/01/27/airline-profits-soar-passengers-fuel/22395509/.

[39]http://www.antitrustinstitute.org/sites/default/files/Letter%20to%20DOJ_Collusion%20Probe_F.pdf.

[40] *Id*.

[41] http://www.bloomberg.com/news/articles/2015-07-16/what-does-it-take-to-prove-airline-collusion-.



55.     These developments made the leadership of IATA very happy. In February of

2011, an IATA press release noted with respect to North American air transportation carriers,

that "[a] key feature in 2010 was the capacity discipline…."[42] Similarly, in a June of 2013 speech

delivered in Cape Town, Tony Tyler, the Executive Director of IATA who succeeded Bisignani,

noted that airline profits were coming from better use of capacity, citing an industry load factor[43]

of "80.3%, which is an increase of ten percentage points over the last decade."[44] And an IATA

analysis, published in June 2015 (in conjunction with the General Meeting referenced below), on

the "Economic Performance of the Airline Industry" noted approvingly that the profitability of

the United States airlines had increased the most, and concluded that "US airlines consolidated

after the global financial crisis and . . . have been very disciplined about adding capacity."[45]

---

[42] http://www.iata.org/pressroom/pr/Pages/2011-02-02-01.aspx.

[43] As explained on American's website, in the airline industry, the "load factor" consists of
system-wide revenue passenger miles (a paying passenger flying one mile creates a revenue
passenger mile) divided by available seat miles (one seat—empty or filled—flying one mile
creates an available seat mile).
http://www.aa.com/i18n/amrcorp/corporateInformation/facts/measurements.jsp.

[44] http://www.iata.org/pressroom/speeches/Pages/2013-06-03-02.aspx.

[45] http://www.iata.org/whatwedo/Documents/economics/Economic-Performance-of-the-Airline-

56.     The Defendants' position on capacity has been disseminated by the organization

Airlines for America, a trade group to which they all belong and which provides a convenient

forum for discussion of both the industry position on capacity and on other topics, such as

common bag check fees or reservation cancellation charges.

### SOUTHWEST'S RECENT CONDUCT AND REACTIONS AT THE 2015 IATA GENERAL MEETING

57.     On May 20, 2015 Kelly, the CEO of Southwest, announced a break in this

industry front, saying that Southwest planned to increase its capacity by as much as eight percent

by acquiring two new gates at its hub at Love Field, Dallas. The industry reaction was

instantaneous. The stock prices of the other Defendant airlines plummeted. "Understandably,

investors are questioning if this signals the end of the era of industry capacity discipline,"

Raymond James analyst Savanthi Syth wrote in a research note.[46] Similarly, Wolfe Research

airline analyst Hunter Keay said that "[d]omestic capacity discipline has effectively vanished."[47]

58.     The other airlines decided they had to ensure that Southwest did not break rank on

the capacity issue. On June 7-9, 2015, IATA held its Annual General Meeting in Miami, Florida.

Chief executives of many of the leading passenger airlines were in attendance. During the course

of that meeting, several of them spoke publicly about the need for "discipline" within the

industry.[48] Delta's President, Ed Bastian, said that Delta is "continuing with the discipline that

---

Industry-mid-year-2015-forecast-slides.pdf. By comparison, as noted by IATA, other markets are fragmented; the top four airlines in Europe have only a collective 36% market share

[46] http://www.reuters.com/article/2015/05/20/us-airlines-competition-dallas-idUSKBN0O52U220150520.

[47] http://www.wsj.com/articles/southwests-upgraded-growth-plans-stir-airline-stocks-1432157456.

[48] http://www.nytimes.com/2015/06/12/business/airline-discipline-could-be-costly-for-passengers.html.

the marketplace is expecting." American's chief executive, Douglas Parker, stated that the

airlines had learned their lessons from past price wars; "I think everybody in the industry

understands that." Air Canada's chief executive, Calin Rovinescu, echoed these settlements,

saying "People were undisciplined in the past, but they will be more disciplined this time." As

one commentator, James B. Stewart, observed in a June 11, 2015 *New York Times* article,

"'Discipline' is classic oligopoly-speak for limiting flights and seats, higher prices and fatter

profit margins. This year, that discipline seems to be working: the I.A.T.A. projected this week

that airline industry profits would more than double this year to nearly $30 billion, a record."[49]

The same article noted:

> "When airline industry leaders say they're going to be
> disciplined,' they mean they don't want anyone to expand
> capacity," said Fiona Scott Morton [Morton], professor of
> economics at Yale and a former deputy attorney general in the
> antitrust division of the Justice Department. "And when there
> aren't enough seats, airlines raise prices. That's what we've been
> seeing."[50]

59.     These pronouncements by airline executives and the pressure placed on

Southwest at the IATA Annual General Meeting had the desired effect. The *New York Times*

article cited above reported that "after coming under fire at this week's conference, Southwest

quickly moved to reassure investors it isn't going rogue. 'We have taken steps this week to begin

pulling down our second half 2015 to manage our 2015 capacity growth…' Kelly said." It is

clear that Southwest knuckled under to the collusive "discipline" imposed by its competitors.[51]

60.     United States Senator Richard Blumenthal ("Blumenthal") was incensed at these

---

[49] *Id.*

[50] *Id.*

[51] *Id.*

developments. On June 17, 2015, he wrote a letter to United States Assistant Attorney General

William Baer.[52]  With respect to the withdrawal by Southwest of its plans to increase capacity,

Blumenthal stated that "[t]he conclusion seems inescapable that the remarks made at IATA were

targeted at Southwest and that its capitulation was the result of the 'fire' aimed at the company."

61.     The letter further states:

> Recently, the International Air Transport Association (IATA)
> brought together the top executives of the world's largest airlines
> at its annual meeting in Miami, Florida. The *New York Times*
> reported that at this meeting many of these competitors publicly
> discussed their strategies to remain "disciplined" in their decisions
> to manage capacity across their flight routes. As you know from
> the Department of Justice's (DOJ's) investigation into US
> Airways' merger with American Airlines in 2013, most airlines
> have traditionally viewed capacity reductions as a highly valuable
> way to artificially raise fares and boost profit margins. In light of
> the recent unprecedented level of consolidation in the airline
> industry, this public display of strategic coordination is highly
> troubling.
>
> Therefore, I urge the Justice Department to investigate this
> apparent anti-competitive conduct potentially reflecting a misuse
> of market power, and excessive consolidation in the airline
> industry. DOJ itself played a part in this consolidation by
> approving several mergers and now consumers are paying sky-
> high fares as airlines engage in market conduct designed to keep
> capacity artificially low.

62.     Blumenthal's letter concluded:

> In August 2013, the Justice Department filed an antitrust lawsuit to
> block the proposed merger between US Airways and American
> Airlines. A few months later, DOJ settled that case and allowed the
> merger to proceed subject to a number of gate divestitures. As a
> result of that merger, just four major airlines now account for
> eighty percent of all domestic air travel.
>
> DOJ's original complaint painted a stark picture of an extremely
> consolidated market, in which a few firms wield enormous market

---

[52]http://www.blumenthal.senate.gov/imo/media/doc/20150617%20Blumenthal%20to%20DOJ%
20Airline%20Coordition.pdf.

power to the detriment of consumers and competition – and in which high-level executive believe there is an unmistakable link between fluctuations in capacity and fares hikes. During the course of the Antitrust Division's review of the American Airlines / US Airways merger, your staff studied the internal analyses and the planning documents put together by both companies in considering the likely effects of the merger. During DOJ's original announcement rejecting the merger you stated, "High level executives at US Airways have talked about how consolidation allows for capacity reductions that "enable" fare increases."

In particular, DOJ's complaint provided evidence of past behavior by US Airways to punish a rival for its reducing fares; it also alleged that the merger would reduce capacity and growth across the industry; and result in increased coordinated interaction among the remaining legacy airlines.

The Complaint specifically documented the troubling history of US Airways communicating directly to a rival airline that it was upset by that airline's efforts to compete more aggressively. In 2010, senior executives at US Airways complained that competition from the rival airline was "hurting profitability" in the industry. DOJ wrote: "[S]enior management debated over email about how best to get the rival airline's attention and bring it back in line with the rest of industry. . . .

The Justice Department also correctly predicted that this kind of behavior would continue should the merger be allowed to proceed – as it ultimately was. In the original complaint, DOJ wrote, "The structure of the airline industry is already conducive to coordinated behavior…the legacy airlines closely watch the pricing moves of their competitors. When one airline 'leads' a price increase, other airlines frequently respond by following with price increases of their own."

To bring home the point, the Complaint follows, "Coordination becomes easier as the number of major airlines dwindles and their business models converge."

I agree. I therefore urge the Antitrust Division to conduct a full and thorough investigation of anticompetitive, anti-consumer conduct and misuse of market power in the airline industry, evidenced by recent pricing patterns as well as remarks made at the IATA conference. Consumers are paying sky-high fares and are trapped in an uncompetitive market with a history of collusive behavior. If you find that these comments were coordinated to punish Southwest Airlines' announcement of capacity increases, I urge

you to use all the tools at your disposal to punish this anti-
competitive and anti-consumer behavior.

63.     The DOJ acted promptly. On July 1, 2015, it was reported that the DOJ had sent

CIDs to a number of airlines on June 30, 2015. A spokesperson for DOJ, Emily Pierce,

confirmed this report, saying the Department was investigating "possible unlawful coordination"

to limit capacity increases, and thereby keeping ticket prices high.[53] Defendants all received

these and the inquiry extends to their relationships with common investors.[54]

64.     This was not a minor matter. The DOJ's *Antitrust Division Manual* states that

CIDs may be served on suspected violators if "there is 'reason to believe' that any violation

within the Division's scope of authority has occurred." *See* United States Department of Justice,

*Antitrust Division Manual*, at III-45 (5th ed. April 2015).[55] As Gene Kimmelman, a former

official in the Antitrust Division, has noted, "[t]he Justice Department doesn't just launch

investigations as fishing expeditions…. There's a keen awareness that when they request

documents, there's a significant cost to companies, it's not easy and there are a lot of

expenditures. . . . They have to have a strong reason to believe there may be a violation of law."[56]

65.     The CIDs have not officially been made public, but the *Dallas Morning News*

---

[53] http://www.cnn.com/2015/07/01/politics/doj-subpoenas-airlines-unlawful-coordination/.

[54] http://www.crainsnewyork.com/article/20150922/TRANSPORTATION/150929964/antitrust-
officials-probe-airlines-with-shared-investors. For Securities & Exchange Commission filings on
this topic, *see* http://ir.united.com/phoenix.zhtml?c=83680&p=irol-
SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWd
lPTEwMzkzMzM4JkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDVElPTl9FTlRJUkUmc3V
ic2lkPTU3;
https://www.sec.gov/Archives/edgar/data/4515/000119312515261937/d945812d10q.htm;
https://www.sec.gov/Archives/edgar/data/92380/000009238015000098/luv-6302015x10q.htm.

[55] http://www.justice.gov/sites/default/files/atr/legacy/2015/05/13/atrdivman.pdf.

[56] http://www.washingtonpost.com/business/economy/doj-investigating-potential-airline-
collusion/2015/07/01/42d99102-201c-11e5-aeb9-a411a84c9d55_story.html.

obtained a copy of one of them and summarized the requests contained in it as follows:

> – Tell us who in your company sets the communications strategy to shareholders, investors or analysts and who does that communication.

> – Give us any documents "discussion [*sic*] (a) the need for, or the desirability of, capacity reductions or growth limitations by the company or any other airline; or (b) the undesirability of your company or any other airline increasing capacity."

> – Give us any of your documents that talk about changes in your capacity or that of your competitors.

> – Give us any communications between you and outside parties about your capacity or that of your competitors and how capacity changes affect fares, revenues or profits.

> – Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have involving industry analysts (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts)

> – Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have had involving other airlines in which capacity was discussed (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts)

> – We want to know everybody who owns at least 2 percent of your company, including the time that person owned that much of your company.

> – Concerning those people who owned at least 2 percent, tell us about all your meetings, appointments or conference with those people in which industry capacity was discussed. We want to see any calendars, appointment books, day planners, etc., that were involved, as well as any documents prepared for those discussions and which talked about those discussions afterward.

> – We want to know how much capacity you flew, in available seat miles, every month since January 2010, and please include the seat miles flown by your regional partners as well.

> – Spell out your document retention policy including emails.

> – Tell us who is preparing this information and submitting it to us.

> If someone gives that preparer some oral instructions, tell us who
> gave the oral instructions and what he and she said.[57]

66.     Also, on July 1, 2015, George Jepsen, the Attorney General of the State of

Connecticut, announced that his office is conducting a similar investigation into collusive

activity among air carriers and had sent letters to Delta, United, American and Southwest.[58]

67.     Blumenthal welcomed the DOJ's action, saying "[t]his investigation must be

tireless and timely to save consumers from the onslaught of price increases in summer fares that

may result from collusive and anticompetitive airline company misconduct."[59] Schumer agreed,

stating that "[i]t's hard to understand, with jet fuel prices dropping by 40 percent since last year,

why ticket prices haven't followed….We know when airlines merge, there's less price

competition."[60]

68.     The Business Travelers Coalition ("BTC") also applauded the initiation of this

investigation:

> "The number one concern that antitrust experts have - with no
> close second - as with regard to radical consolidation of any
> industry, is the risk of tacit competitor coordination on policies,
> practices and prices among a reduced number of industry
> participants," stated BTC chairman Kevin Mitchell. "Since recent
> U.S. airline mega-mergers, we have witnessed near constant airline
> CEO calls for 'capacity discipline' during industry gatherings and
> analyst earnings calls only to be echoed by analysts in follow-on
> earning calls with other airlines. This represents perhaps the

---

[57] http://aviationblog.dallasnews.com/2015/07/ap-justice-is-looking-into-airline-collusion-on-holding-down-capacity.html/.

[58] http://www.reuters.com/article/2015/07/01/us-airlines-connecticut-probe-idUSKCN0PB61520150701.

[59] http://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-statement-on-doj-investigation-into-potential-airline-collusion.

[60] http://www.npr.org/sections/thetwo-way/2015/07/01/419245511/justice-department-investigating-airlines-for-possible-price-collusion.

darkest hours of airline coordination as well as a too-cozy harmonization between airlines and Wall Street," added Mitchell.[61]

69.     The same article noted that the "tacit coordination on capacity" was accompanied by an "even more aggressive and widely coordinated attack on price transparency, consumer protections and competition." The BTC offered the following evidence of this coordinated attack by Defendants:

ANCILLARY FEE DATA

Since 2008, the Big Three U.S. airlines (Delta Air Lines, American Airlines, United Airlines) have rejected their most valued corporate customers' demands for ancillary fee data that would enable their business travelers to efficiently see, compare and buy ancillary services (e.g., checked bags, preferred seats) in the same transaction as the base airfare. Leisure travelers must navigate airline websites in search of best airfare and ancillary fee combinations often paying higher prices than necessary. In total, this opacity results in these ancillary fees not being disciplined by market forces. Likewise, there is great profit in consumer confusion.

PASSENGER FACILITY FEES

Airports use PFCs to add gates and other facilities to attract additional airlines to compete for local travelers' business expanding consumer choice and disciplining incumbent airlines' prices. The Big Three seem to not want new competition.

. . . .

NORWEGIAN AIR INTERNATIONAL'S (NAI) APPLICATION

Under the EU-US Open Skies agreement, NAI's application to serve the U.S. should have been a 5-week pro forma review and approval. Instead, airlines' political pressure has held up approval for 15 months. This is as embarrassing to the United States as it is outrageous in its harm to U.S. consumers. Airlines fear that if NAI's low-fare business model were to be embraced by U.S. consumers, other carriers like Ryanair and JetBlue would seek to emulate NAI's success.

---

[61] http://www.businesstravelcoalition.com/press-room/2015/july-1---btc-applauds-us.html.

U.S. DOT CONSUMER PROTECTION AUTHORITY

The Big Three fought the Full Fare Advertising Rule promulgated in 2011 by DOT. When DOT implemented the rule to safeguard consumers' interests, the airlines sued DOT in federal district court and lost. They then went to the Supreme Court, which rejected their pleas. Airlines finally turned to the U.S. House of Representatives to pass the Orwellian named Transparent Airfares Act of 2014. The bill, luckily rejected by the Senate, would have increased airlines' revenues and profits by obscuring the true price of air travel options.

PROTECTION FROM GULF CARRIER COMPETITION

The Big Three claim that the Gulf airlines -- Emirates, Qatar and Etihad -- receive government support that is harming the U.S. carriers. The Big Three co-opted Congress again with a Congressional letter that supports the Big Three's call for a freeze in new air services by the Gulf airlines -- all without having allowed those carriers an opportunity to respond to the allegations, not to mention the glaring hypocrisy that the U.S. airline industry, by the Big Three's very own math, has been the most heavily taxpayer subsidized and structurally advantaged in the history of commercial aviation. Brazenly, the airlines recently warned the Obama Administration that if they don't play ball, the Big Three will again seek Congressional legislative support.[62]

70.     The AAI in its aforementioned letter to DOJ had also expressed serious concerns about the Defendants' possible collusive imposition of ancillary fees (and their potential coordination through IATA on such matters), as well as their efforts to limit data available to online travel services.[63].

71.     The BTC and AAI are not alone in their concerns about Defendants' efforts to

---

[62] Through the efforts of Delta, American and United and the Airline Pilots Association, 262 members of the United States House of Representatives and 22 senators have asked the President in the letter referred to by BTC to freeze the number of flights into the United states by Persian Gulf airlines; the three carriers also met separately with the Secretaries of State, Transportation and Commerce to press this demand. http://www.washingtontimes.com/news/2015/oct/14/big-3-airlines-flexing-their-political-muscle-in-w/?page=all.

[63]http://www.antitrustinstitute.org/sites/default/files/Letter%20to%20DOJ_Collusion%20Probe_F.pdf.

curb fare transparency to customers as a facilitating device to keep domestic air passenger fares high. On May 19, 2015, the Travel Technology Association issued a report, prepared by Charles River Associates and authored by the aforementioned Morton entitled, "Benefits of Preserving Consumers' Ability to Compare Airline Fares."[64] The report noted that competition had suffered because of domestic passenger airline mergers and efforts by the major airlines to lead travelers away from online travel agencies ("OTAs") that facilitate price comparisons of fares and other anticompetitive aspects of the recent consolidation in the domestic air passenger services industry.  Its major findings were:

- Restrictions by airlines of broad access to airline information—prices and schedules—substantially reduce consumer welfare. This study estimates the potential reduction in net consumer welfare of limiting airline price and schedule information to only airline websites could exceed $6 billion per year. Additionally, such restrictions may result in up to 41 million passengers annually choosing not to fly.

- In addition to offering independent price comparisons, OTAs and metasearch travel sites provide consumers with other travel information, such as suggestions for places to go and things to do. Supplementing airline schedule information with complementary information and products expands the market for air travel, further increasing consumer welfare.

- Airline markets are highly concentrated, with significant barriers to entry. The recent merger of American Airlines and US Airways has led to fare increases in affected city-pair markets that are about 4 percent higher than in non-affected markets. In certain city-pair markets in which the merger reduced the number of significant competitors from 3 to 2, or from 2 to 1, fare increases have been 7 to 17 percent. The welfare-enhancing impacts of broad access to airline fare and schedule information may be even larger in duopoly or monopoly city pairs.

- Airline profits globally are at an all-time high, expected to reach $25 billion for 2015.  While airline fuel prices declined nearly 25 percent last year, average domestic airfares have remained flat while ancillary revenue of the major U.S. airlines grew to over $15 billion in 2014.

---

[64] http://www.traveltech.org/wp-content/uploads/2015/05/CRA.TravelTech.Study_.pdf.

72.     The report went on to note that the airlines have engaged in coordinated efforts to stifle online metasearch airfare websites. These efforts included the following conduct:

- Prohibiting metasearch sites from referring consumers to an OTA for booking a flight.

- Prohibiting OTAs from providing airline information to metasearch sites.

- Prohibiting GDSs from providing airline price and schedule information to "unauthorized" metasearch sites.

- Prohibiting onward-distributing flight schedule information to metasearch sites by services such as Innovata.

- Refusing to pay metasearch sites for direct referrals to the airline's own booking website.

- Prohibiting metasearch sites from displaying price information of the airline.

The report offered specific examples of such conduct undertaken by Delta, American, and United. The report estimated that in the absence of transparent information about airfares, the airlines earn approximately an extra $30 on each leisure and unmanaged business passenger.

73.     In response to the airlines' assertions that they price airfares on demand, Dr. Morton said in the aforementioned *New York Times* article that "'on most airline routes, consumers have very little choice.' She noted that only since the recent wave of consolidation among airlines have they been able to set prices significantly above marginal cost. 'That's great for the industry but not for consumers,' she said."[65]

74.     Schumer has expressed his concerns on this point:

With high ticket prices, additional fees and limited carriers, we must ensure airlines aren't taking further steps to prevent consumers from comparison shopping. That's why, in light of the

---

[65] http://www.nytimes.com/2015/06/12/business/airline-discipline-could-be-costly-for-passengers.html.

recent Justice Department probe into possible airline collusion, I am urging the feds to step up their efforts and do a full investigation into this new deceiving practice that limits access to cheaper, more affordable airfares for consumers. So many consumers rely on bargain hunting when purchasing flights and this practice makes it almost impossible by restricting transparency and limiting competition among airlines….Freezing out websites that save travelers money on airfare is just plain wrong and the feds should include this practice in their investigation immediately.[66]

75.     Despite the actions of the DOJ, some of the Defendants refuse to give up on "capacity discipline." Thus, on July 10, 2015, American announced that it was reducing its capacity plans for 2015 even further.[67]

76.     However, since the DOJ's investigation began, airfares have started to decline significantly, suggesting that Defendants are reacting explicitly to the governmental probe. This is reflected in the following chart from BloombergBusiness:[68]

---

[66] http://www.schumer.senate.gov/newsroom/press-releases/schumer-reveals-in-move-that-could-cost-travelers-6-billion-more-a-year-airlines-are-working-to-prevent-consumers-from-shopping-around-for-best-flight-price-by-refusing-to-share-flight-info-with-websites-like-expedia-orbitz-tripadvisor-and-others-senator-pushes-feds-to-investigate-new-airline-policyon-top-of-current-collusion-investigation.

[67] http://aviationblog.dallasnews.com/2015/07/american-airlines-cuts-2015-capacity-plans-a-bit.html.

[68] http://www.bloomberg.com/news/articles/2015-09-22/do-airfares-rise-when-carriers-have-same-investors-u-s-asks.



**Probe Unfolds as Fares Decline**
Antitrust regulators weighed in amid a drop in ticket prices to the lowest since 2010

SOURCE: Airline Reporting Corp.

Bloomberg

Commentators have noticed the connection. As stated in one article, "[t]he ramped-up competition comes after stubbornly high fares drew the attention of federal investigators. The Justice Department started investigating the nation's four largest airlines this summer for potentially colluding to limit their growth -- and keep prices high."[69] The present conduct by Defendants indicates they had the ability to lower airfares but collectively chose not to do so until the government's investigation forced their hand.

## TOLLING AND ACCRUAL OF CAUSE OF ACTION

77.     Plaintiff and the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein no earlier than July 1, 2015, the date when news reports first disclosed that DOJ was investigating Defendants for "possible unlawful coordination" to limit capacity increases.

78.     No information in the public domain was available to Plaintiff and members of the Class prior to the announced DOJ investigation on July 1, 2015, which revealed sufficient information to suggest that Defendants were involved in an anticompetitive conspiracy to restrain trade in the market for air passenger transportation services.

79.     Defendants' and their co-conspirators' collusive acts in furtherance of their

---

[69] http://www.dailyherald.com/article/20151109/business/151109740/.

conspiracy were inherently self-concealing and carried out in a manner that defied and precluded detection by Plaintiffs and members of the Class.

80.     Because Defendants and their co-conspirators successfully and actively concealed the existence of their conspiracy, prior to July 1, 2015, Plaintiff and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for passenger airline fares.

81.     Moreover, Plaintiff and members of the Class could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy. The conspiracy as alleged herein was fraudulently concealed by Defendants through various means and method, including, but not limited to, secret meetings and surreptitious communications among Defendants by the use of telephone and/or in-person meetings at trade association gatherings (and elsewhere) in order to prevent the existence of written records.

82.     Up to July 1, 2015, Defendants had portrayed their conduct as completely innocent and noncollusive and, indeed, even after the CIDs were issued, they have continued to do so.

83.     Thus, for example, on July 2, 2015, Airlines for America, the trade group to which Defendants belong, stated that "investigators will not be able to find any signs of collusion among U.S. airlines, despite the recent trend of consolidation within industry" and that the group was "confident that the Justice Department will find what we know to be true: our members compete vigorously every day, and the traveling public has been the beneficiary, as domestic

fares are actually down thus far in 2015.".[70]

84.     As detailed in the 2013 DOJ complaint and the 2015 AAI letter to DOJ, the airline mergers were often preceded by assurances that airline capacity would not be reduced and, in point of fact, capacity reductions did thereafter occur.

85.     In their Form 10-Ks filed with the Securities & Exchange Commission, the Defendants have stated repeatedly that they operate in a highly competitive market and that intense competition occurs on routes, prices, services and the like.[71]

86.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators until July 1, 2015, Plaintiff and the members of the Class had no knowledge of the alleged conspiracy or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed.

87.     None of the facts or information available to Plaintiff and members of the Class prior to July 1, 2015, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to that date.

88.     For these reasons, the statute of limitations applicable to Plaintiff and the Class' claims alleged herein was tolled and did not begin to run until July 1, 2015.

---

[70] http://thehill.com/policy/transportation/246780-airlines-we-compete-vigorously-every-day.

[71] *See, e.g.*, http://phx.corporate-ir.net/phoenix.zhtml?c=117098&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTEwMDk5Mtk1JkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDVElPTl9FTlRJUkUmc3Vic2lkPTU3; http://ir.delta.com/files/Annual%20Meeting/2015/2014-DAL-10-K_v001_j37ksn.PDF; http://www.sec.gov/Archives/edgar/data/92380/000009238015000027/luv-12312014x10k.htm; http://ir.united.com/phoenix.zhtml?c=83680&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTEwMDkxNjI5JkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDVElPTl9FTlRJUkUmc3Vic2lkPTU3.

## CLASS ACTION ALLEGATIONS

89.     Plaintiff brings this action on her own behalf and as a class action pursuant to

Rule 23(a) and (b) of the Federal Rules of Civil Procedure on behalf of the following Class (the

"Class"):

> All persons and entities that purchased air passenger transportation
> services for flights within the United States and its territories and
> the District of Columbia from Defendants or any predecessor,
> subsidiary or affiliate thereof, at any time between January 1, 2009
> and the present.  Excluded from the class are governmental
> entities, Defendants, any parent, subsidiary or affiliate thereof, and
> Defendants' officers, directors, employees, and immediate
> families.

90.     Plaintiff does not know the exact number of members of the Class because such

information is in the exclusive control of Defendant.  Due to the nature of the trade and

commerce involved, however, Plaintiff believes that Class members number at least in the

thousands and are sufficiently numerous and geographically dispersed throughout the United

States so that joinder of all Class members is impracticable.

91.     There are questions of law and fact which are common to the claims of Plaintiff

and the Class, including, but not limited to:

a.      Whether Defendants engaged in a combination or conspiracy with their

co-conspirators to fix, raise, maintain, and/or stabilize the prices for fares charged for air

passenger transportation services;

b.      Whether the purpose and/or effect of the acts and omissions alleged herein

was to restrain trade, or to affect, fix, control, and/or maintain the prices for air passenger

transportation services;

c.      The existence and duration of the horizontal agreements alleged herein to

fix, raise, maintain, and/or stabilize the prices for air passenger transportations services;

d.      Whether Defendants violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

e.      Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

f.      Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

g.      Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act.

92.     Plaintiff's claims are typical of the claims of the members of the Class.

93.     Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

94.     Plaintiff is represented by counsel competent and experience in the prosecution of antitrust and class action litigation.

95.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

96.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards

of conduct for Defendants.

b.      The Class is readily definable and one for which records should exist in the files of Defendants.

c.      Prosecution as a class action will eliminate the possibility of repetitious litigation.

d.      Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e.      Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

97.     This class action presents no difficulties of management that would preclude its maintenance as a class action.

## COUNT I

### Violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)

98.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

99.     Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of air passenger transportations services for flights within the United States in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

100.    Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive

levels the prices of air passenger transportations services.

101.    In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize air passenger transportations services.

102.    The illegal combination and conspiracy alleged herein had the following effects, among others:

a.    The prices charged by Defendants to, and paid by Plaintiff and members of the Class for passenger fares were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b.    Plaintiff and members of the Class have been deprived of free and open competition in the purchase of air passenger transportations services;

c.    Plaintiff and members of the Class have been required to pay more for air passenger transportations services than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy;

d.    Competition in the sale of passenger air transportation has been restrained, suppressed or eliminated.

103.    As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays:

A.    That the Court determine that this action may be maintained as a class action

under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.      That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act;

C.      That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class;

D.      That the Court award Plaintiff and the Class treble damages;

E.      That the Court award Plaintiff and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

F.      That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

G.      That the Court award Plaintiff and the Class such other and further relief as may be deemed necessary and appropriate.

Dated: November 9, 2015                    Respectfully submitted,


By:     */s/ Hilary K. Scherrer*
        Hilary K. Scherrer (# 481465)
        Michael D. Hausfeld (# 153742)
        Jeannine M. Kenney (# 997080)
        HAUSFELD LLP
        1700 K Street NW, Suite 650
        Washington, DC 20006
        Tel: (202) 540-7200
        Fax: (202) 540-7201
        Email:  mhausfeld@hausfeld.com
                hscherrer@hausfeld.com
                jkenney@hausfeld.com

        Michael P. Lehmann
        Bonny E. Sweeney
        Christopher L. Lebsock
        HAUSFELD LLP
        600 Montgomery Street, Suite 3200
        San Francisco, CA 94111
        Tel:  (415) 633-1908
        Fax:  (415) 358-4980
        Email:  mlehmann@hausfeld.com
                bsweeney@hausfeld.com
                clebsock@hausfeld.com

        Christopher L. Sagers
        1801 Euclid Ave., LB 138
        Cleveland, Ohio 44115
        Tel:  (216) 687-2344
        Email:  chrissagers@yahoo.com

        *Counsel for Plaintiff and the
        Proposed Class*